IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE JEWISH FEDERATION OF          :
GREATER WASHINGTON, INC.
                                  :

v.                                :   Civil Action No. DKC 23-1816

                                  :

THE CINCINNATI INSURANCE COMPANY
                                  :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this insurance coverage dispute are the motion for summary judgment filed by Plaintiff The Jewish Federation of Greater Washington, Inc. ("the Federation" or "Plaintiff") (ECF No. 48), and the cross-motion for summary judgment filed by Defendant The Cincinnati Insurance Company ("CIC" or "Defendant") (ECF No. 58). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, both motions will be denied.

**I.    Background**

**A. Factual Background[1]**

The Federation's amended complaint asserts breach of contract and declaratory judgment claims against CIC, seeking indemnity and defense costs in connection with a claim made against it by ORT

---

[1] Unless otherwise noted, the following facts are undisputed.

America, Inc., and the Women's American ORT Foundation (collectively "ORT").

The Federation is a non-profit charitable organization that "serves various communities and other charitable organizations in the nation's capital region, including the District of Columbia and Maryland." (ECF No. 48 at 5). "One of the Federation's functions is to manage and invest funds held for the benefit of other Washington, D.C.-area charitable organizations[,]" including ORT. (*Id.*). The Federation maintains insurance. One of the Federation's policies was Policy Number EMN 044 97 53 ("CIC Policy"), a "claims made" policy issued by CIC for the period of August 15, 2017, to August 15, 2020. The CIC Policy includes three coverage sections: (1) General Provisions Applicable to All Liability Coverage ("General Provisions"), (2) Nonprofit Organization Directors and Officers Liability Coverage ("D&O"), and (3) Employment Practice Coverage. (ECF No. 58-3).

The Federation was also insured under Policy Number 8260-9776 ("Chubb Policy"), a "claims made" ForeFront Portfolio For Not-for-Profit Organizations Policy issued by Federal Insurance Company with a policy period of August 1, 2020, to August 1, 2021. The Chubb Policy contains four coverage sections: (1) Directors & Officers Liability and Entity Coverage Section, (2) Employment Practices Liability Coverage Section, (3) Fiduciary Liability

2

Coverage Section, and (4) Crime Non-Liability Coverage Section. (ECF No. 48-7).

In or about June and July 2020, the Federation fell victim to a fraudulent scheme through which it caused four wire transfers, totaling $7,500,000, to be initiated from ORT's funds to unauthorized third-party bank accounts in Hong Kong.

On August 12, 2020, the Federation's insurance agent emailed CIC saying, "Please find attached letters provided by the insured, as notice of wrongful acts (dated 6/10/20; 6/20/20; 7/10/20; 7/20/20); which may give rise to a management liability claim." (ECF No. 48-8, at 2). Four of the attached letters were addressed to banks in China stating, "The Jewish Federation of Greater Washington would like to report a fraud perpetrated on our account at PNC Bank where each of your organizations played a role in that fraud." (ECF No. 48-8, at 3-6). In each of the four letters, Plaintiff listed the date in which the fraudulent transfer was initiated, the amount transferred, and the wire transfer bank details, including the account number and beneficiary address. (*Id.*). In the fifth letter, Plaintiff wrote to PNC Bank, as a follow up to an earlier phone call, reporting the fraudulent transfers. (*Id.* at 7).

On August 13, 2020, Defendant acknowledged receipt of Plaintiff's email, stating:

The Cincinnati Insurance Company ("CIC") has issued a Pillar Policy to The Jewish Federation of Greater Washington (JFGW). On behalf of CIC, I am in receipt of an e-mail from your insurance agent, Associated Insurance Management, to place CIC on notice of wrongful acts dated 6/10/2020, 6/20/2020, 7/10/2020, and 7/20/2020. Attached to this e-mail were five copies of correspondence which appeared to be directed to PNC Bank by JFGW in which JFGW advised PNC Bank of fraudulent wire transfers against their accounts at PNC Bank and requesting PNC Bank to report this fraud to certain Hong Kong banks that were the recipients of the fraudulent wire transfers.

. . . .

The information provided to CIC to date lacks notice of the specific "wrongful act", the damages that may arise from a "wrongful act" and the circumstances by which the Insureds first became aware thereof, as such, CIC is unable to identify the nature and circumstances of the "wrongful act(s)" that the Insureds believe may give rise to a "claim". In order for CIC to accept the Insured's notice in this matter, please provide us with additional information or materials identifying the **specific** "wrongful act(s)" alleged against the Insureds, the injury or damage that may arise from the "wrongful act(s)" and the circumstances by which the Policy Insureds firm became aware of the "wrongful act(s)" that may give rise to a Claim under the Policy. **Notice must be provided to CIC on or before the policy expiration date of August 15, 2020 – 12:01AM Eastern Standard Time.**

(ECF No. 48-9 at 2-3).[2]  Plaintiff responded on August 21, 2020, with more details surrounding the fraud:

---

[2] Plaintiff contends the August 13, 2020 letter "stated that the [Plaintiff's] notice of wrongful acts was 'lack[ing]' but did

The Federation's understanding of what happened that led to the four fraudulent transfers has been rapidly evolving since the Federation first became aware that there had been a hack into its system on August 4 . . . . Upon review, it became clear that several prior log-ins had not been properly authorized. By the next day, August 5, the Federation had learned that the bad actor(s) had successfully infiltrated the system to defraud the Federation. As you will have seen from the five letters dispatched to PNC and the four receiving banks in Hong Kong, the Federation took prompt action to attempt to freeze the transfers, totaling as you saw $7,510,700, and alerted the FBI and other authorities. . . .

As for the possible wrongful act by the Federation staff, the investigation shows that the Federation CFO failed to follow proper protocols in responding to multi-authentication queries, on multiple occasions, after the bad actor(s) had obtained one or more passwords by unknown means. These deviations from the multi-authentication protocol allowed the bad actor(s) to access the Federation's computer system multiple times and simulate requests for transfer of funds that appeared authentic. All four transfers were from accounts held for another charity organization for which the Federation manages endowment funds.

(ECF No. 48-12, at 16-17).  Defendant responded on September 1, 2020, stating:

In your August 21st correspondence you provide additional factual detail surrounding the fraudulent wire requests and indicated that the possible wrongful act of the [Federation] was "*the investigation shows that the Federation CFO failed to follow proper*

not provide any explanation of why the notice was purportedly insufficient." (ECF No. 48-1 ¶ 31).

> *protocols in responding to multi-*
> *authentication queries, on multiple*
> *occasions, after the bad actor(s) had obtained*
> *one or more passwords by unknown means. These*
> *deviations from the multi-authentication*
> *protocol allowed the bad actor(s) to access*
> *the Federation's computer system multiple*
> *times and simulate requests for transfer of*
> *funds that appeared authentic. All four*
> *transfers were from accounts held for another*
> *charity organization for which the Federation*
> *manages endowment funds.*
>
> . . . .
>
> . . . As the policy has expired your
> subsequent information provided to CIC on
> August 21st was after the expiration of the
> policy period. Therefore, the time period to
> place CIC on notice of a specific "wrongful
> act" in accordance with Section VI of the
> General Provisions has expired and the
> Insureds can no longer place CIC on notice of
> facts and circumstances that could potentially
> lead to a "claim" pursuant to Section VI of
> the General Provisions.

(*Id.* at 13-15).

On September 29, 2020, ORT made a written demand against

Plaintiff for monetary damages in the amount of $7,510,700 ("ORT

Claim"), stating:

> As you are aware, this office represents [ORT]
> in connection with their claim against the
> Jewish Federation of Greater Washington (the
> "Federation") for the data breach, which
> resulted in the preventable theft of
> significant funds from the accounts of [ORT]
> held and managed by . . . the Federation.
>
> . . . .
>
>     After investigation . . . there is
> substantial reason to believe that the breach

6

> occurred due to the wrongful acts, negligence,
> and failure of the Federation in not following
> proper protocols to protect these accounts.
>
> Consequently, on behalf of [ORT], we
> hereby make demand on the Federation to remit
> the total amount of $7,510,700 plus expenses,
> including all legal fees and costs, incurred
> in this matter, in addition to lost
> earnings . . . .

(ECF No. 48-10, 2). Plaintiff forwarded the ORT Claim to Defendant

on September 30, 2020. (ECF No. 48-11, 2-3). On October 15, 2020,

Plaintiff paid for, and the Defendant issued, an optional one year

extended reporting period endorsement for the D&O coverage with an

effective date of August 14, 2020. (ECF No. 58-3, at 3-4).

On November 10, 2020, Defendant informed Plaintiff that:

> While the September 29th demand e-mail
> constitutes a "claim" for "wrongful acts", it
> is unclear whether the Extended Reporting
> Periods were still in effect at the time
> Cincinnati was notified of the e-mail demand
> on September 30, 2020.
>
> . . . .
>
> Thus, the Extended Reporting Periods
> provided to the Federation immediately
> terminate on the effective date and time of
> any other insurance issued to the Federation
> which replaces the Policy. As previously
> stated, we understand that upon the non-
> renewal of the Policy, the Federation was
> issued D&O coverage by Chubb. Thus, before
> Cincinnati can provide confirmation that
> coverage is available to the Federation under
> the Policy, Cincinnati must determine whether
> the D&O coverage issued by Chubb replaced the
> Policy, thereby terminating the Extended
> Reporting Periods and barring coverage to the

Federation under the Policy for the September 29th e-mail demand.

In order for Cincinnati to full[y] evaluate the foregoing, please provide me with the following (1) the Cyber Policy issued by Travelers to the Federation and any coverage correspondence; (2) the Cyber Policy issued by Chubb to the Federation and any coverage correspondence; and (3) the D&O Policy issued by Chubb to the Federation and any coverage correspondence.

. . . .

As mentioned above, Cincinnati is unable at this time to provide confirmation that the Policy provides coverage to the Federation. In order to fully evaluate whether coverage is provided to the Federation, Cincinnati needs to review the information requested above. Upon Cincinnati's review of the requested information, Cincinnati will provide the Federation with a subsequent coverage letter advising whether coverage is provided under the Policy.

(ECF No. 48-12, at 2-8). Plaintiff provided Defendant with the requested documents on November 23, 2020. Defendant subsequently denied Plaintiff coverage on the basis that the ORT Claim was not made during the policy period or an applicable extended reporting period. On May 31, 2021, Plaintiff and ORT settled the ORT Claim. (ECF No. 48-13 at 2-9).

**B. Procedural Background**

This matter was transferred from the United States District Court for the District of Columbia to this court on July 7, 2023. (ECF No. 27). Plaintiff filed an amended complaint on July 13,

8

2023 (ECF No. 33).  On August 21, 2024, Plaintiff moved for summary judgment (ECF No. 48), and on October 16, 2024, Defendant filed a cross motion for summary judgment and opposition to Plaintiff's motion (ECF No. 58).[3]  Plaintiff filed a reply in support of its motion and an opposition to Defendant's motion on November 25, 2024 (ECF No. 60), and Defendant responded on January 8, 2025 (ECF No. 61).

## II.  Standard of Review

A court may grant summary judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)) (alteration in original).  "A mere

---

[3] On September 20, 2024, the court limited the parties' motion and cross-motion for summary judgment solely to the issue of liability.  (ECF No. 57).

scintilla of proof . . . will not suffice to prevent summary judgment[.]" *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011). The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., Federal Practice & Procedure § 2720 (4th ed. 2022). The court has an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

## III. The CIC Policy

Insurance policies are interpreted according to the same rules as any other contract. *See Rouse v. Fed. Ins. Co.*, 991

F.Supp. 460, 465 (D.Md. 1998).  Courts are instructed to interpret an insurance policy's terms "as a whole, according words their usual, everyday sense, giving force to the intent of the parties, preventing absurd results, and effectuating clear language." *United Cap. Ins. Co. v. Kapiloff*, 155 F.3d 488, 495 (4th Cir. 1998)(applying Maryland law).  Neither party contends the CIC Policy is ambiguous.  *See Cap. City Real Est., LLC v. Certain Underwriters at Lloyd's London, Subscribing to Pol'y No.: ARTE018240*, 788 F.3d 375, 379 (4th Cir. 2015) (quoting *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013) ("If the policy's language is clear and unambiguous, the court will assume the parties meant what they said.")).  On the other hand, "[i]n the event of ambiguity, Maryland courts consult extrinsic evidence, and only if this extrinsic evidence fails to clear up the ambiguity is the contract construed against the insurer." *Kapiloff*, 155 F.3d at 495.

Section I of the D&O coverage under the CIC policy, titled "Insuring Agreements" provides, in relevant part:

> We[4] will pay on behalf of the **insured persons** all **loss** which the **organization** is required to pay resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, against the **organization** for a **wrongful act**.

---

[4] The CIC Policy uses the words "we," "us," and "our" to refer to CIC.  (58-3, at 7).

(ECF No. 58-3, at 31).    The CIC Policy defines the following relevant terms:

> **A. Claim** means: (1) A written demand for monetary damages or non-monetary relief . . . against any **insured**, including any appeal therefrom.
>
> . . . .
>
> **K. Insured** means the **organization** and the **insured persons**.
>
> **L. Insured persons** means: **Directors and officers** . . . .
>
> . . . .
>
> **N. Loss** means **defense costs** and the total amount of monetary damages which the **insured** becomes legally obligated to pay on account of any **claim** for a **wrongful act** with respect to which coverage hereunder applies, including damages, judgments, settlements, prejudmgnet and postjudgment interest . . . .
>
> **O. Organization** means the **named insured**[5] and any **subsidiary.**
>
> . . . .
>
> **W. Wrongful act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty including any **personal injury** or **publishers liability** committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Nonprofit Organization Directors and Officers Liability Coverage Part Declarations and prior to the end of the **policy period** by . . . The **organization.**

---

[5] The Federation is the named insured under the CIC Policy (ECF No. 58-3, at 5)

(*Id.* at 31-34).  The CIC Policy's policy period is August 15, 2017, to 12:01 a.m. Eastern Standard Time August 15, 2020, (*Id.* at 5), and "Extended reporting period" "means the period of time described in Section XIX of the General Provisions." (*Id.* at 7).

Section VI of the CIC Policy details the process by which insureds must provide notice to Defendant if the insured wants to seek coverage for wrongful acts committed during the policy period but for which a claim is made later.  Section VI states:

> If prior to the end of the policy period of the applicable Coverage Part, any of the **insureds** first become aware of a specific **wrongful act** they believe is likely to give rise to a **claim**, and if any of the **insureds** give us written notice as soon as practicable, but prior to the end of the **policy period** of the applicable Coverage Part, of:
>
> A. The specific **wrongful act**;
> B. The injury or damage which has or may result therefrom; and
> C. The circumstances by which the **insureds** first became aware thereof:
>
> then any **claim** subsequently made arising out of such **wrongful act** shall be deemed to have been made when notice of the **wrongful act** was first given.

(*Id.* at 10-11).  Section XIX provides:

> A. Upon termination of any Coverage Parts for any reason, other than nonpayment of premium, the **named insured** shall be provided a 90 day Automatic Extended Reporting Period . . . .
>
> 1. Automatic Extended Reporting Period

> A 90 day Automatic Extended Reporting Period is automatically provided without additional charge. The Automatic Extended Reporting Period starts immediately after the end of the **policy period** of the applicable coverage part.
>
> . . . .
>
> E. Any Extended Reporting Period will immediately terminate on the effective date and time of any other insurance issued to the insureds which replaces this insurance. The entire premium for any Extended Reporting Period shall be fully earned at the commencement of any Extended Reporting Period.

(ECF No. 58-3, at 14). Thus, there are two avenues for making a timely claim for events occurring during the policy period for which a claim is asserted later: providing notice of the wrongful act during the policy period or reporting a claim during an extended reporting period.

## IV. Analysis

This case is about whether Defendant is required to provide coverage to Plaintiff with respect to the ORT Claim under the terms of the CIC Policy. Plaintiff argues both that it provided timely notice during the policy period in its August 12, 2020 email to Defendants, and during the extended reporting period in its September 30, 2020 email to Defendants. (ECF No. 48, 9-10). Defendant, in turn, contends that the August 12, 2020 email and attached letters were insufficient to provide the requisite notice of a claim and the September 30, 2020 email, while a claim, was

14

outside of the policy period and no extended reporting period was in effect. (ECF No. 58, 8-9).

**A. Notice During the Policy Period**

Defendant argues that Plaintiff's August 12, 2020 email did not provide notice of a "wrongful act." Plaintiff, in contrast, asserts that the August 12, 2020 email "identified and described the specific wrongful acts—the four wire transfers initiated where the underlying requests for the transfers and back up information supporting the transfers were fabricated and fraudulent—by referencing and attaching five letters concerning four wrongful acts dated '6/10/20; 6/20/20; 7/10/20; 7/20/20.'" (ECF No. 48, at 19). Specifically, Plaintiff contends that the letters identified and described (1) "the four specific wrongful acts, namely the . . . errant acts of initiating four wire transfers[;]" (2) "the quantum of injury or damage, $7,510,700" and "the impact that the transfers would have during the COVID pandemic[;]" and (3) "how the [Plaintiff] first became aware of the wrongful acts." (ECF No. 48 ¶¶ 6-8). Defendant responds that the "communications do not identify any wrongdoing committed by [Plaintiff] that is likely to give rise to a **claim** made *against* [Plaintiff]." (ECF No. 58, 9).

The letters attached to the email begin with the following:

> The Jewish Federation of Greater Washington would like to report a fraud perpetrated on our account at PNC Bank where each of your

> organizations played a role in that fraud.
> On . . ., we initiated a wire . . . to Hong
> Kong where the underlying requests and back up
> information was fabricated and fraudulent.

(ECF No. 48-8, at 3-6).  Each of the four letters lists the date in which the fraudulent transfer was initiated, the amount transferred, and the wire transfer bank details, including the account number and beneficiary address.  (*Id.*).  Glaringly, none of the letters detail a "wrongful act" as defined under the CIC Policy because they fail to state an "error, misstatement, misleading statement, act, omission, neglect or breach of duty." (ECF No. 53-3, at 33-34).  While the letters explain that Plaintiff initiated a wire and the underlying requests were fraudulent, Plaintiff's letters do not say that the act of initiating the wire was an error.  (ECF No. 48-8, at 3-6).  The letters also do not indicate how the wire transfers would likely give rise to a claim. Plaintiff cites to its application for coverage and generally contends that Defendant understood Plaintiff's operations such that Defendant should have known the wired funds belonged to a third party.  (ECF No. 60, at 6-10).  The "Nature of Plaintiff's Business" is described as follows:

> The Jewish Federation of Greater Washington,
> Inc. (the Jewish Federation) began in 1925 as
> the Jewish Welfare Association. Today, The
> Jewish Federation and its United Jewish
> Endowment Fund support 35 local agencies, 14
> national organizations, 4 overseas partners
> and more than 60 congregations. The Jewish

16

> Federation works in conjunction with its partners to provide funding . . . that impacts some 110,000 Jewish households (268,000 people), as well as many members of the general community throughout the Washington metropolitan area. Around the world our efforts support rescue, relief, reconstruction, and renewal for tens of thousands more in Israel and in more than 60 countries the world . . . .

(ECF No. 60, at 7). Despite Plaintiff's contentions, the application does not explain that Plaintiff solely holds funds for other organizations. The August 12, 2020 email and attached letters did not give Defendant notice of a wrongful act and therefore Plaintiff's claim cannot survive to the extent it relies on them. Accordingly, Defendant's motion for summary judgment will be granted on this portion of Plaintiff's claim.

**B. Extended Reporting Period**

Plaintiff additionally contends that the September 30, 2020 email is a claim for wrongful acts made within the CIC Policy's Extended Reporting Period provided in Section XIX.E. (ECF No. 48, at 20). Defendant agrees the September 30, 2020 email constituted a claim, but argues that there was no Extended Reporting Period in place because the Chubb Policy replaced the CIC Policy. (ECF No. 58, at 30-32).

17

It is undisputed that the Chubb Policy was issued on August 1, 2020, and the CIC Policy's policy period ended on August 15, 2020. The parties dispute whether the Chubb Policy replaced the CIC Policy and terminated the CIC Policy's 90 day Automatic Extended Reporting Period.

Plaintiff argues that the Chubb Policy "does not 'replace' the [CIC] Policy . . . it overlaps with it." (ECF No. 60, at 18). Plaintiff contends the CIC Policy and the Chubb Policy have "key differences . . . that demonstrate the coverages provided by the policies were not similar, let alone identical." (*Id.* at 19). Specifically, Plaintiff notes that the CIC "Policy ***provided*** coverage for wrongful acts arising out of a data breach while the Chubb Policy ***excluded*** coverage for wrongful acts arising out of a data breach." (*Id.* at 20).[6] The Privacy and Data Breach Exclusion in the Chubb Policy states, in relevant part:

> The Company[7] shall not be liable under Insuring Clauses 2 and 3 of this Coverage Section for **Loss** on account of any **Claim** based upon, arising from or in consequence of any actual or alleged:
>
> (A) Unauthorized or unlawful access to, alteration of, or damage to any computer,

---

[6] In Defendant's response to Plaintiff's statement of undisputed facts, Defendant contends that the CIC Policy contains a "cyber exclusion," but Defendant does not argue that the cyber exclusion would preclude Plaintiff's claim. (ECF Nos. 58-18, at 15; 58-3, at 34).

[7] "The Company" refers to Federal Insurance Company, the insurer of the Chubb Policy. (ECF No. 48-7, at 2).

> computer program, computer network or
> computer database, including but not
> limited to the infection of any of the
> foregoing through the transmission of a
> computer virus, malware, spyware or other
> fraudulent or unauthorized computer code
> that: (1) modifies, alters, damages,
> destroys, deletes, records or transmits
> information; (2) contaminates other
> computer programs or computer data; or (3)
> consumes computer resources or in some
> fashion usurps the normal operation of a
> computer system . . . .

(ECF No. 48-7, at 53).  Plaintiff cites to *Admiral Insurance Co. v. John Stromberg & Associates*, 77 Md.App. 726 (1989), to support its interpretation of the meaning of the term "replace."  (ECF No. 60, at 18).  In *Admiral Insurance Co.*, the Appellate Court of Maryland explained:

> The word "replace," especially in a legal
> context, "is generally defined to mean the
> 'restoring to a former condition,' or 'the
> providing of an equivalent for.'" *Piazza v.
> Clackamas Water District*, 21 Or.App. 469, 535
> P.2d 554, 557 (1975), quoting from Black's and
> Webster's dictionaries. It means to "supplant
> with a substitute or equivalent," *Olenick v.
> Government Employees Insurance Co.*, 42 A.D.2d
> 760, 346 N.Y.S.2d 320, 321 (1973), to "put
> something in the place of something else."
> *Wade v. Lewis*, 561 F.Supp. 913, 937 (N.D. Ill.
> 1983). The word ordinarily connotes an event—
> the actual substitution or restoration—and not
> merely a proposal or offer to substitute or
> restore.

77 Md.App. at 738.  Plaintiff contends that "[t]hese definitions of 'replace' applied to Section XIX.E demonstrate that insurance that 'replaces' the CIC Policy is insurance that 'supplants' the

CIC Policy with a 'substitute or equivalent.'" (ECF No. 60, at 18). Defendant responds that "[t]he Policy does not state that the other insurance must be identical or the same as Cincinnati [I]nsurance" and "[i]t does not state that every claim submitted to Cincinnati must also be covered by the other insurance." (ECF No. 61, at 16). Defendant notes that, under *Admiral Ins. Co.*, a "substitute" is enough, the Chubb Policy does not have to be an "equivalent" policy. (*Id.* at n.5).[8]

On this point, it is not clear that the CIC Policy is unambiguous. The term "replace" is not defined. The parties discuss at length the meaning of the word "replace," but do not discuss the word in the context of the operative clause of XIX.E, which is "any other insurance issued to the insureds which replaces this insurance." (ECF No. 58-3, 14). The CIC Policy does not define "any other insurance," however, the phrase appears in Section X of the CIC Policy which states:

> This insurance is primary except when all or any part of **loss** is also insured under any other prior or current policy. If *any other insurance* issued by another insurer . . . applies to any **claim**, then this insurance is excess over that other insurance . . . unless that insurance was purchased

---

[8] Defendant also notes that "the discussion in *Admiral* [*Ins. Co.*] 'was within the context of determining whether a proposal to offer insurance is an actual replacement, i.e., a substitution . . . *Admiral* [Ins. Co.] did not address the issue of whether a policy replaces another policy." (ECF No. 61, at 16 n.5).

> specifically to apply excess over the limits
> provided in this policy.

(ECF No. 58-3, at 12) (emphasis added).  Section X uses the phrase "any other insurance" on a claim-by-claim basis, not in reference to the CIC Policy as a whole.  The parties have not briefed what "any other insurance" means or how it may affect the meaning of "replace."  Nor does the record reflect whether the ORT Claim is, or is not, covered by the Chubb policy.  Further briefing and perhaps argument is necessary.

**V.    Conclusion**

For the foregoing reasons, both motions for summary judgment will be denied, although the court finds, under Fed.R.Civ.P. 56(g), that there is no genuine dispute of fact regarding whether the August 12, email was sufficient notice.  It was not and that fact will be treated as established.  A separate order will follow.


                                            /s/
                              DEBORAH K. CHASANOW
                              United States District Judge